**HORST v. BALDWIN et al.**

Civil Action No. 80–W.

United States District Court
N. D. West Virginia.

Feb. 11, 1949.

G. K. Kump and J. S. Zimmerman, both of Romney, W. Va., for plaintiff.

Lee Bushong, Jr., of Charles Town, W. Va., for defendant.

BAKER, District Judge.

Cecelia A. Horst, a resident of Hagerstown, Maryland, filed a suit in equity in the Circuit Court of Hampshire County, West Virginia, on March 15, 1948, against George E. Baldwin, a resident of New York City, New York, and certain other named defendants, to set aside a contract entered into between herself and Mr. Baldwin on September 3, 1947, and for other relief she claimed against Mr. Baldwin. On July 28, 1948, the case was duly removed to this court.

The facts in this case, insofar as I deem them pertinent to the questions before me, are as follows:

Cecelia A. Horst is a lady seventy-seven years of age, who has been a widow since 1941. Long prior to her husband's death and ever since, she has resided in Hagerstown, Maryland. She is the owner of considerable real estate in Hagerstown, consisting of a residence and business property. In addition to that, she owns about twelve thousand acres of mountain land in Hampshire County, West Virginia, and

682

Frederick County, Virginia. This land had been originally owned by a company, of which her husband was Treasurer, and she acquired a fee simple title thereto for a cash outlay of about twelve thousand dollars.

The defendant is a man sixty-nine years of age, who resides in New York City, and who described his business as "Real estate and promotions." (See Transcript of Evidence, p. 131.) He further testified that he had. been in that business for forty years, and that he owned it himself.

Sometime in 1944 or 1945, the exact date being not clear from the testimony, but also of little importance, Mr. Baldwin heard through a Congressman named Dempsey, with whom he was acquainted, about Mrs. Horst and about the land she owned in West Virginia. and Virginia. Mr. Baldwin called upon Mrs. Horst at her home in Hagerstown. After some negotiations between Mr. Baldwin and Mrs. Horst, she executed an option, in which she agreed to sell to Mr. Baldwin her land in Hampshire County, West Virginia, and Frederick County, Virginia, "at and for One Hundred Thousand ($100,000) Dollars, payable as follows, viz.,—Twenty Thousand ($20,000) Dollars on the 30th day of July 1946, and the balance to be secured by a first mortgage on the property for Eighty Thousand ($80,000) Dollars, and interest at five (5) per cent per annum, payable as follows:— in five (5) years from and after the date of the conveyance, with interest payable annually after the date of the conveyance."

This option was executed November 27, 1945, and contained the further provision: "This agreement is made on condition that the option hereby given is accepted within eight months after the date hereof by the down payment of Twenty Thousand ($20,- 000) Dollars, and the giving of the first mortgage on the property to be conveyed."

It will be observed that this paper, while it was given for a mere nominal consideration, would, had it been accepted and complied with by Baldwin, have resulted in an advantageous sale by Mrs. Horst. She would have gotten a very good price for her property. $20,000 in cash would have been received in eight months, and $80,-

000, with 5% interest, over the next five years; hence, Mrs. Horst was apparently making a very profitable disposition of real estate which had originally cost her $12,- 000. On the other hand, Mr. Baldwin was getting an eight-months' option for nothing. However, this option gave him no right to use the property in any manner, nor could Baldwin interfere with Mrs. Horst's use during the eight-months' period. This option was not taken up by Mr. Baldwin.

Sometime later, at a date again not quite clear, but also unimportant, Mrs. Horst, in consideration for a cash payment of Twenty-five Dollars ($25) to her by Mr. Baldwin, extended this option for two additional months. It was not taken up in that period, and apparently by September 27, 1946, Mr. Baldwin had lost any claim he might have had to demand a sale of the property to him.

There were, however, further negotiations between Mr. Baldwin and Mrs. Horst and in January of 1947, Mr. Baldwin had prepared in a New York law office an agreement looking to the purchase of this property. On September 2, 1947, Mr. Baldwin came to Hagerstown and called upon Mrs. Horst at her residence. At that time he made her a new proposition. He showed her the contract, which had been prepared in January in New York, and the two of them suggested certain changes. Finally Mrs. Horst and Mr. Baldwin each signed copies of this contract, and Mr. Baldwin left Mrs. Horst's home and went to his hotel. The following morning, September 3, 1947, Mr. Baldwin returned to Mrs. Horst's home and told her that the other contract had been so scratched up and interlined that he had had it retyped, and asked her to destroy the copy of the contract he had signed the preceding night, and to execute the new contract which he alleged was identical, except that the interlineations and corrections had been typed in. He then tore his copy of the preceding night's contract in two and threw it in a wastebasket, and told Mrs. Horst that he would trust her to destroy her copy. She mentioned something about submitting the new contract to an attorney. Mr. Baldwin told her that an attorney would only

hold them up as to time, and charge them a lot of fees, and that there was no need for her to consult counsel. She then signed the contract, and he departed for New York. It is this contract which is in controversy in this action.

It is truly a remarkable document, especially in view of the fact that all of the previous negotiations between Mr. Baldwin and Mrs. Horst had been for a purchase of the property for $100,000, of which $20,000 was to be cash, and $80,000 payable in a relatively short time. The new contract requires some detailed comment. By it, Mrs. Horst, the seller, agrees to sell and convey to Mr. Baldwin, the buyer, all of the land shown on two maps attached to it. This land is that heretofore referred to as the West Virginia and Virginia land. The purchase price is set out in Paragraph 2 as being $130,800, inclusive of interest, payable as follows: $5,000 payable annually, on February 1, 1949, through February 1, 1953; $10,000 annually, on February 1, 1954, through February 1, 1958; and $11,160 annually, on February 1, 1959, through February 1, 1963. And then comes Paragraph 3 of the contract, which I feel should be quoted in full:

"The Buyer shall have the right and privilege of paying the sum of $20,000.00, including the sum of $5,000.00 due on February 1, 1949 aforementioned, on or before December 31, 1949. In the event he does so, the Seller shall convey to him the property aforementioned simultaneously with said payment of $20,000.00 or with any payment which together which any prior payment shall equal the sum of $20,000.00. In the event, the Buyer makes such payment of $20,000.00 the Seller shall make and deliver to the Buyer at the time of payment of said sum of $20,000.00 or the balance thereof, a mortgage in the sum of $80,000.00 with interest at the rate of 4% per annum payable semi-annually, which mortgage shall be amortized by payments of $1000.00 semiannually commencing with the date of such conveyance until February 1, 1963, upon which date the principal balance shall be due and payable."

After some other provisions, we come to Paragraph 7, which I feel also should be quoted in its entirety:

"Until the delivery of deed by Seller to the Buyer, the Buyer shall have the sole possession and sole right to possess each and every part of said property and to use and obtain the benefits of said property to the same extent as if he were the sole owner thereof. While in possession of said premises as aforementioned, the Buyer shall pay all taxes, insurance and maintenance expenses on said property to the same extent as if he were the sole owner thereof."

We have now this truly remarkable document. It gives Baldwin, the buyer, the right to use the property "as if he were the sole owner thereof" from the date the contract was signed, September 3, 1947, until February 1, 1949, without paying one penny purchase price to the seller. As soon as this contract was signed, Mr. Baldwin was privileged to go on the land involved, to remove the timber therefrom, to sell that timber, to remove and sell any minerals he could find; in short, to treat it exactly as his own property, and he had this right for seventeen months before he was required to pay out any of his own funds at all. In addition to that, while Paragraph 2 of the contract stipulates the purchase price as being $130,800, Paragraph 3 requires the seller to make a conveyance to the buyer upon the payment of $5,000 on or before December 31, 1949; and, in the event this is done, requires the seller at the same time to give the buyer a mortgage for $80,000 upon the property. In other words, by paying a mere $5,000 on or before December 31, 1949, the buyer could obtain fee simple title to the property and put himself in position to discharge the lien for $80,000 if he wished to convey the property; or, stated in still another way, he could for $5,000 acquire fee simple title to the property, free of any enforcible lien of record. Mr. Baldwin attempted to explain away the fact that the seller was required to give the buyer a mortgage by saying that that was a typographical error for which the typist in New York was to blame. He claimed that his intention had been that the buyer should give the seller such a mortgage. This was undoubtedly what Mrs. Horst thought the contract called for. However, when Mr.

Baldwin left the torn contract in Mrs. Horst's wastebasket, she recovered the pieces and kept them in an envelope and produced them at the trial. These pieces show that the contract, as drafted in New York, required the buyer to give the seller a mortgage, but that Mr. Baldwin had struck out with a pen the words "buyer" and "seller," and written above them the opposite terms. It was from this corrected contract that the retyping was done in Hagerstown; hence, we have undisputed proof that the confusion between the terms buyer and seller in Paragraph 3 was deliberately made by Mr. Baldwin originally in his own handwriting and later, under his direction, reduced to typing.

But how different is this from the first option executed by the plaintiff. It is further a noteworthy fact that all through the dealings between the parties every writing was prepared by Mr. Baldwin and, on the occasions when Mrs. Horst suggested seeking the advice of counsel, Mr. Baldwin discouraged her.

After this strange contract was executed, Mrs. Horst suggested that perhaps she should have some notes, and Mr. Baldwin executed and delivered to her notes, totaling $130,000 but which are in no way described in the contract or secured by any lien on the property involved, and which were dated September 3, 1948, rather than September 3, 1947.

About September 15, 1947, Mr. Baldwin went upon the property involved and there conferred with one, George E. Johnson, who had been cutting timber therefrom under a contract with Mrs. Horst. At this time Baldwin, according to Johnson, said he had a deed for the property and had paid Mrs. Horst $5,000 down. According to Baldwin, he told Johnson that he had a deal for the property and was to pay Mrs. Horst $5,000. At any event, Baldwin told Johnson that future payments for timber removed, or what is know as "stumpage," were to be made to him and not to Mrs. Horst. Eventually, Johnson did pay to Baldwin $166.93 for the August stumpage.

On October 7, 1947, Mrs. Horst and Baldwin exchanged checks for $500 each. On October 27, they exchanged checks for $500. On December 16, they exchanged checks for $625, and Mrs. Horst gave Mr. Baldwin an additional check for $50. Mr. Baldwin cashed all of Mrs. Horst's checks, which were duly honored by the bank upon which they were drawn. None of Mr. Baldwin's checks were honored. All were returned by the bank "Not sufficient funds." Eventually, Mr. Baldwin gave Mrs. Horst a check, dated February 16, 1948, for $1,775, to take up the prior checks he had given her and which had proved worthless. This last check was also returned by the bank to Mrs. Horst, as not covered by sufficient funds.

The testimony of Mr. Baldwin and Mrs. Horst, concerning these checks, is far from clear. Mr. Baldwin says, in effect, that he was attempting to exploit some deposits of kaolin clay that were on the land, and that this necessitated certain preliminary investment. He then says that when Mrs. Horst learned of his deal in the kaolin clay that she sought to go in with him, and that he took her in as a one-fourth partner in that particular part of the transaction; that her checks to him were to cover her share of the preliminary expense, and that his checks to her were to insure her against ultimate loss in event that the kaolin deal fell through. Mrs. Horst simply says they traded checks, and doesn't attempt to offer an explanation as to why. The one admitted fact is that the net result of this feature of the parties' dealings was that Mr. Baldwin admittedly owes Mrs. Horst $1,775 on account of these bad checks.

There was further testimony regarding another transaction, between Mr. Baldwin and Mrs. Horst, in which Mr. Baldwin took steps looking to getting the financial management or control of Mrs. Horst's Hagerstown property. However, this deal fell through and since it occurred after the transactions involved in this suit, I think it fruitless to here speculate on what might have been its result.

I have detailed the above facts in the form of a narrative. Except where my statement expressly indicates a doubt as to the exact purport of the testimony, I now find that these are the facts proven in

this case. From these facts I make the following

### Conclusions of Law.

■ The contract between Mrs. Horst and Mr. Baldwin, dated September 3, 1947, was procured upon Mr. Baldwin's part by fraud and misrepresentation. Even if it had been properly procured, I hold as a matter of law that it is unenforcible for ambiguity on its face. I, therefore, decide that as a matter of law this contract must be vacated and annulled, and that Mrs. Horst is entitled to recover from Mr. Baldwin any sum or sums which may have resulted from his use of the property during the time this contract was ostensibly in force.

■ This question of damages should be referred to a Master to ascertain the amount due by reason thereof from Mr. Baldwin to Mrs. Horst. I further find that Mr. Baldwin owes Mrs. Horst $1,775 upon the transaction involving the checks, and that he owes her $166.93 for the August, 1947, stumpage, which he collected from Johnson. Both of these amounts should bear interest from the dates of the respective transactions involved. The notes, which Mr. Baldwin executed in favor of Mrs. Horst, should be surrendered by her to him or his counsel.

I request counsel to meet with me in Martinsburg on April 6, 1949, at 10 a. m., for the purpose of preparing an order carrying out the provisions of this memorandum.